# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

ANGELA EVANS

Plaintiff,

v.

NYE COUNTY, a political subdivision of the
State of Nevada; DAVID BORUCHOWITZ,

Defendants.

Case No. 2:20-cv-1919-RFB-VCF

**ORDER**

## I.    INTRODUCTION

Before the court are four motions: Defendants' Motion for Summary Judgment (ECF No. 63), Defendants' Motion to Seal (ECF No. 64), Plaintiff's Motion for Leave to File Supplemental Brief (ECF No. 81), and Defendants' Motion to Strike Plaintiff's Motion (ECF No. 82).  Plaintiff partially opposed Defendants' Motion for Summary Judgment, voluntarily dismissing her Fourth Amendment unlawful search claims. ECF No. 70. Accordingly, this Court considers whether summary judgment is appropriate as to Plaintiff's false arrest claims under 42 U.S.C. § 1983 and Nevada common law, and Plaintiff's <u>Monell</u> claims against NCSO.[1]

For the reasons stated below, the Court grants in part and denies in part Defendants' motion for summary judgment and grants Defendants' motion to seal. The Court denies both Plaintiff's motion for leave to file a supplemental brief and Defendants' motion to strike as moot.

/

/

---

[1] <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

## II.     PROCEDURAL BACKGROUND

On October 15, 2020, Plaintiff commenced this case by filing a complaint raising three operative claims against three defendants: David Boruchowitz ("Boruchowitz"), Nye County Sheriff's Office ("NCSO") and Nye County. ECF No. 1. On November 12, 2020, Boruchowitz filed an Answer in this proceeding.  ECF No. 6.  Also on November 12, 2020, Defendant NCSO filed a Motion to Dismiss the proceeding pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 7.  This case was originally assigned to District Court Judge Gordon.[2] On November 12, 2020, Valley Electric Association ("VEA"), Plaintiff's former employer, filed a Motion to Intervene, ECF No. 9, and a Notice of Related Cases. ECF No. 10.  Plaintiff filed the associated case in the Eighth Judicial District on June 1, 2020, raising various state and federal employment discrimination claims. VEA removed the associated employment discrimination case to this Court on June 6, 2020.  See generally ECF No. 10-1.  The employment discrimination case was filed before the instant case, and was captioned 2:20-cv-986-RFB-VCF.

On December 15, 2020, District Judges Gorden and Boulware issued an Order transferring the instant case from Judge Gorden's docket to Judge Boulware's docket, as the employment discrimination case was already on Judge Boulware's docket.  ECF No. 24.  On January 7, 2021, the Court denied VEA's Motion to Intervene as moot. ECF No. 27.   The employment discrimination case was administratively transferred to Judge Traum on May 18, 2022.[3]

On February 10, 2021, the parties filed a stipulated Protective Order and Confidentiality Agreement that the Court subsequently granted.  ECF Nos. 30, 31.  On May 17, 2021, VEA filed a Motion for Protective Order.  ECF No. 41. Briefing ended on June 8. 2021.  On June 1, 2021, the parties entered a Stipulation regarding Discovery and Plaintiff's Request to File a First Amended Complaint which the Court granted. ECF No. 35. On June 1, 2021, Plaintiff filed her First Amended Complaint (FAC), bringing claims against Nye County and Boruchowitz only. ECF No. 36.  On June 15, 2021, Defendants jointly answered the FAC and raised affirmative defenses. ECF No. 43.  On July 22, 2021, the Magistrate Judge issued an Order granted in part and denied

[2] Case No. 2:20-cv-01919-APG-DJA.

[3] Case No. 2:20-cv-00986-ART-VCF.

in part VEA's Motion for Protective Order.  ECF No. 54.

On November 10, 2021, Defendants filed a Motion for Summary Judgment. ECF No. 63. Briefing closed on January 18, 2022.  In her Response, Plaintiff only opposed Defendants' motion as to her first claim (false arrest under 42 U.S.C. § 1983) and third claim (false arrest under state law), and voluntarily dismissed her second claim (unreasonable search under 42 U.S.C. § 1983). ECF No. 70.  On September 2, 2022, the Court held a hearing on Defendants' Motions for Summary Judgment and to Seal an Exhibit.  ECF No. 79.  The Court took the motions under submission. Id. After the hearing, the parties filed two additional motions: Plaintiff's Motion for Leave to File a Supplemental Brief (ECF No. 81) and Defendant's Motion to Strike (ECF No. 82). On September 20, 2022, Plaintiff filed a Response to Defendant's Motion to Strike. ECF No. 83. This order follows.

### III.    STATEMENT OF FACTS

#### A.  Undisputed Facts

Based on the record, and the parties' arguments, the Court finds that the following facts are undisputed.

Valley Electric Association (VEA) is a member-owned electric utility cooperative based in Pahrump, Nevada.  Plaintiff, who was appointed as the CEO of VEA on October 1, 2018, was the cooperative's first Hispanic CEO. Boruchowitz was a lieutenant within NCSO in 2019, and reported directly to Sherriff Wehrly, who lead NCSO.

**a.  Boruchowitz's conversations with ex-VEA employee Kenneth Johnson on February 15, 2019 and February 21, 2019.**

On February 15, 2019, Defendant Boruchowitz ("Boruchowitz") met former VEA Vice President Kenneth Johnson at a public park in Pahrump, Nevada. Boruchowitz and Johnson discussed the culpability of the VEA Board of Directors for a utility rate increase administered by Plaintiff in her capacity as VEA CEO.  Former VEA CEO Tom Husted had been accused of various forms of sexual harassment. After Husted's departure, Plaintiff was appointed as an interim CEO and then became Husted's permanent replacement on October 1, 2018.

1   Boruchowitz and Johnson conversed about various VEA decisions and policies with which

2   they disagreed.  Boruchowitz specifically disagreed with how Plaintiff presented a utility increase

3   in a televised appearance.  Johnson mentioned that he did not think there was any criminal activity

4   taking place at the VEA, and that there was a difference between criminal acts and failure to

5   perform one's duties.  Boruchowitz disagreed: "No. Start with dereliction. And then once you're

6   in, you can figure out was there criminal, an then you can go that route."

7   Boruchowitz and Johnson decided to work together with members of the community to

8   support a campaign for new VEA leadership, with Johnson agreeing to spearhead group strategy.

9   Johnson explained to Boruchowitz that as he was no longer with VEA (he had been fired), he

10   would not be a good face of any campaign for reform. Boruchowitz informed Johnson that to

11   restructure the Board, they would have to find financial support that would not be traceable to

12   Johnson.  Both men expressed an interest in serving VEA on the Board, as part of an "alternate

13   slate of directors."

14   On February 21, 2019, Boruchowitz and Johnson met again, this time in Johnson's vehicle.

15   They discussed how they would uncover wrongdoings perpetuated by VEA officials, including by

16   looking into severance payments after wrongfully discharging workers, and financial records more

17   broadly.  Boruchowitz mentioned that while he did not know what percentage of allegations

18   against the VEA and its leadership were true, he knew that media coverage of a criminal

19   investigation would mean "the house of cards is over." Boruchowitz and Johnson discussed an

20   exchange of money, as Johnson came with an envelope of money for Boruchowitz.

21   Boruchowtiz: If the envelope is your half, keep it for

22   right now. Just—

23   Johnson: No, no, no.

24   Boruchowitz: It doesn't—because the situation and

25   the fact that this may go criminal, keep it to avoid

26   the—any appearance of impropriety.

27   Johnson: Okay.

28

- 4 -

1    Boruchowitz: And then at the end, we can—we can

2    figure out what—what we're going to do.   There

3    must be one hell of a wreck.

4    Johnson: Oh, yeah.

5    Boruchowitz: Yeah. Let's—Let's keep it clean.

6    Johnson: Okay.

7    **b.  Investigations between February 21, 2019 – February 26, 2019**

8    On February 21, 2019, NCSO employee Detective Parra applied for a warrant via affidavit

9    raising allegations of illegal activity at VEA, perpetrated by executive leaders. Specifically, the

10    warrant stated that VEA leadership had covered up former-CEO Husted's sexual misconduct, and

11    that interviews with VEA employees "revealed that [Plaintiff], the replacement CEO, additionally

12    received substantial payment and was involved in the handling of payments and nondisclosure

13    agreements to the other employees." The warrant was approved on February 21, 2019.  The warrant

14    was executed on the same day by Boruchowitz and his colleagues at NCSO. NCSO officers

15    directed VEA Human Resources, Information Technology, and Finance departments, along with

16    Plaintiff, to segregate in a conference room while NCSO accessed computer files.

17    After the February 21, 2019 application and warrant, Boruchowitz was contacted by a

18    "street source," namely Kenneth Johnson. Johnson alleged that Plaintiff had VEA perform

19    approximately $89,000 dollars of work at her property to move power lines underground and billed

20    these expenditures to VEA.  The alleged work took place in April of 2018 and the street source

21    believed it involved burying power lines. The subject property was located 3181 E. Winery Road,

22    Pahrump Nevada, 89048.  A "second street source," Joshua Slagowski provided work orders

23    showing VEA work completed at the subject property.  Slagowski is Boruchowitz's friend; they

24    attend the same church and Borochowitz additionally considers Slagowski a family friend. The

25    work orders relate to work VEA completed at the subject property from March to April of 2018.

26    Plaintiff did not own the property outright in April 2018.  She purchased the property on May 8,

27    2018.

28

- 5 -

1       Based on the information from Johnson and Slagowski, Borchuwitz directed Detective

2  Parra to interview a "[VEA] employee." Parra interviewed VEA lineman, Karl Kaucky, outside of

3  Kaucky's residence, on the night of February 25, 2019. Kaucky confirmed VEA completed work

4  around April 2018 at the subject property.  He also stated that work had been done on the property

5  prior to that date.  Kauky admitted that he was not involved in the financial side of things but stated

6  that traditionally the VEA's customers pay for this kind of work.  Boruchowitz reviewed satellite

7  images for the subject property that showed that in 2016 there were power poles on the property

8  but by 2018 the poles had been removed.  On February 26, 2019, Boruchowitz sent Lieutenant

9  Klenczar to the subject property to take photos.  The subject property was the only one on the

10 block that did not have power lines across the back of the property.

11      **c.   February 26, 2019 Warrant and Arrest**

12      On February 26, 2019, Boruchowitz applied for a second search warrant.  In Boruchowitz's

13 application and affidavit, he stated that "[Plaintiff] used her position as CEO to have work

14 conducted by VEA for personal gain at her residence at the cost of the Cooperative membership."

15 Boruchowitz stated that a "street source" came to him and advised him about Plaintiff's

16 misconduct, provided the names of employees to interview about the work completed at Plaintiff's

17 home.  Boruchowitz stated that there was probable cause that Plaintiff had embezzled money from

18 VEA, in violation of Nevada Revised Statute NRS § 205.300, and that the evidence was within

19 the VEA corporate offices.

20      Borchuwitz stated that workorder history for the subject property and financial tracking

21 history for the work orders would provide evidence about Plaintiff using her position as CEO for

22 personal gain.  The application sated that Plaintiff was the confirmed current owner of the subject

23 property.  The affidavit was applied for and approved on February 26, 2019.  Boruchowitz and

24 other NSCO employees executed the warrant that evening, around 4:47 PM. During the execution

25 of the warrant, Boruchowitz spoke with Plaintiff in a VEA office room alone for two minutes.

26 When Bouchowitz asked whether it was Plaintiff's understanding that work involving the moving

27 of wires on the subject property should have been billed to the home contractor with whom she

28 was working, Plaintiff said "yes sir."  Plaintiff also said that she may have paid for the work in her

closing costs. Boruchowitz, separate and apart from this conversation, spoke to Plaintiff's contractor and confirmed that he had not been billed for the work completed in April 2018. Boruchowitz left VEA headquarters to handle a personal matter and returned at 5:35 PM. From 5:36 PM to 5:43 PM, Boruchowitz received all work orders pertaining to the subject property from VEA employees in a thumb drive and spoke with CFO Steve Morrison about the requested orders. Certain of the requested work orders were printed for Boruchowitz by VEA employees during this seven-minute conversation. Borchuwitz made a probable cause determination immediately thereafter, pulling certain colleagues into a side room to let them know his decision.  The conversation lasted one minute, from 5:43 PM to 5:44 PM. Immediately thereafter, at 5:44 PM, Boruchowitz went to Plaintiff's office and arrested her for embezzlement.

**B. Disputed Facts**

Based on the record and the parties arguments, the Court finds that the following facts are disputed. The parties dispute the grounds for obtaining the February 21, 2019 search warrant; whether Borchowitz's "street source" stated prior to the arrest that Plaintiff authorized VEA to perform work at her personal residence in April 2018 or merely that the work was completed at the property located at 3181 E. Winery Road and that VEA paid for it; whether Boruchowitz corroborated and hence knew whether Plaintiff lived at or owned or was in contract for subject at the time the repairs were made and paid for by VEA; whether Boruchowitz corroborated the propriety of billing the April 2018 repairs to VEA as a "systems improvement" and who authorized the billing of the April 2018 repairs; whether the work done by VEA involved putting lines into the ground or removing wires or lines from Plaintiff's property or both, and if the latter, when lines were buried and at whose request and authorization.

The parties further dispute whether Parra's interview with Kaucky verified or corroborated the information provided by Borchuwitz's "street source;" whether Kaucky had direct knowledge that the work being done at the subject property was done for Plaintiff's benefit and at Plaintiff's behest; whether Kaucky's representation left any doubt that wires were moved underground or not, and if so, by whom; whether Kaucky's understanding of how such repairs ought to be billed was reliable given that he was not employed in VEA's finance department and admitted he lacked

specific knowledge about the subject; whether Kaucky informed Parra that the previous builder or contractor, not Plaintiff, had buried the power lines, and whether Borchowitz's educated conclusion could reasonably be that VEA buried power lines at the Property in April 2018 as originally reported by the street source; whether, by February 26, 2019, Borchuwitz could have reasonably believed that Plaintiff was CEO at the time the 2018 repairs were made to the property; whether Plaintiff said she facilitated the work or facilitated the discussion about the work VEA performed in 2018 at the subject property.

## IV.    LEGAL STANDARD

### A.  Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). The nonmoving party may not merely rest on the allegations of her pleadings; rather, she must produce specific facts—by affidavit or other evidence—showing a genuine issue of fact. Anderson, 477 U.S. at 256.

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order." Heinemann v. Satterberg, 731

1    F.3d 914, 915 (9th Cir. 2013).

2    **B.  Embezzlement**

3              Under Nevada law, the crime of embezzlement may take one of two, mutually

4    exclusive, forms. NRS. § 205.300(1).   First, it is prohibited for a bailee to convert money goods

5    or property to his or her own use, "with the intent to steal it or to defraud the owner or owners

6    thereof . . . ." Id.  Second, it is prohibited for any person with whom any money, property or effects

7    have been deposited or entrusted" to use or appropriate the money in any manner or for any other

8    purpose than for which it was prescribed.  Id.

9         A "bailee" is defined as "all persons who are, either as agent, collector or servant,

10   empowered, authorized or entrusted to carry, collect or receive any money, goods or property of

11   another." NRS § 205.300(4); see Anderson v. Baca, 3:16-cv-00545-MMD-WGC, 2020 U.S. Dist.

12   LEXIS 22213 at *13 (D. Nev. Feb. 10, 2020).

13        The two prongs of NRS § 205.300(1) are mutually exclusive. Walsh v. State, 887 P.2d

14   1239, 1240-1241 (Nev. 1994).   In Walsh, the Nevada Supreme Court held that "the first prong of

15   NRS 205.300(1) applies to bailees who allegedly convert property to their own use, and it requires

16   an intent to steal. Id. at 1240.  The second ("fiduciary") prong of NRS 205.300(1) is not applicable

17   in such instances; otherwise[,] the intent requirement would effectively be rendered nugatory." Id.

18        "The key distinguishing element of the crime of embezzlement is the element of

19   entrustment."  Batin v. State, 38 P.3d 880, 883 (Nev. 2002) (en banc). "In order to be guilty of

20   embezzlement, a [person] must have been entrusted with lawful possession of the property prior

21   to its conversion" and such possession may be constructive or actual. Id.  Constructive possession

22   is "both the power and the intention at a given time to exercise dominion or control over a thing,

23   either directly or through another person or persons." Id. (internal citation omitted).  In Batin, the

24   Nevada Supreme Court held that because the plaintiff in that case had not been entrusted with

25   lawful possession of the currency he allegedly took, he did not embezzle these funds.  Id.

26   **C.  Motion to Seal**

27        Courts have long recognized "a general right to inspect and copy public records and

28   documents, including judicial records and documents." Kamakana v. City & Cty. of Honolulu, 447

F.3d 1172, 1179 (9th Cir. 2006) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 & n.7 (1978) (quotation marks omitted)). However, this right is not absolute. Id. There is a "strong presumption in favor of access" to dispositive motions or their attachments, and a party seeking to seal such document bears the burden of overcoming this presumption by providing a compelling and fact-based reason for the document to be sealed. Id. (citations and quotation marks omitted). "[I]f the court decides to seal certain judicial records [attached to dispositive motions], it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." Id. at 1179 (internal citation and quotation marks omitted).

## V.   DISSCUSSION

### A. Fourth Amendment False Arrest Claim pursuant to 42 U.S.C. § 1983

Plaintiff first brings claims for false arrest and false imprisonment under 42 U.S.C. § 1983. To assert a § 1983 claim, a person must allege that an officer acting under color of law violated the person's constitutional rights. Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1989). A warrantless arrest violates the Fourth Amendment if the arrest is not supported by probable cause. Blankenhorn v. City of Orange, 485 F.3d 463, 470-71 (9th Cir. 2007).

An arrest is supported by probable cause if, "[at] the moment of arrest the facts and circumstances within the knowledge of the arresting officer and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the [arrestee] had committed or was committing an offense." Id. at 471 (internal citations omitted).  An officer may not ignore exculpatory evidence that would "negate a finding of probable cause." Broam v. Bogan, 320 F.3d 1023, 1032 (9th Cir. 2003).

A finding of probable cause "supports an arrest" for a specific criminal offense "regardless of [the] stated reason for the arrest." Edgerly v. City and County of San Francisco, 599 F.3d 946, 954 (9th Cir. 2010). "Probable cause may exist for an arrest for a closely related offense, even if that offense was not invoked by the arresting officer, as long as it involves the same conduct for which the suspect was arrested."  Blankenhorn, 485 F.3d at 472.  When specific intent is a required

1    element of the offense, however, officers must have probable cause for that element in order to

2    reasonably believe that a crime has occurred." Gasho v. United States, 39 F.3d 1420, 1428 (9th

3    Cir. 1994) (noting that to "reasonably believe that a crime has occurred" when the underlying

4    statute requires specific intent for the given offense, an arresting officer must have probable cause

5    relating to the arrestee's mental state) see also Phillips v. United States, 356 F.2d 297, 303 (9th

6    Cir. 1965) (holding that "actual knowledge, not constructive knowledge," of an unlawful act

7    allows an inference of specific intent).

8         Though a reasonable officer can be excused for mistakes of fact or law, there are situations

9    where it is up to the jury to determine whether such mistakes were reasonable in the circumstances.

10   Johnson v. Bay Area Rapid Transit Dist., 724 F.3d 1159 (9th Cir. 2013) (citing Pearson v.

11   Callahan, 555 U.S. 223, 231 (2009); Santos v. Gates, 287 F.3d 846, 855 n.12 (9th Cir. 2002)).

12                    **a.  Probable Cause for Embezzlement for Bailees**

13        Under Nevada law, the two enumerated forms of embezzlement are mutually exclusive—

14   one has an intent requirement and the other does not. See generally Walsh, 887 P.2d at 1240.

15   Therefore, the Court may not treat these crimes as "related" or "similar" for the purposes of

16   probable cause. Blankenhorn, 485 F.3d at 472; see also Walsh, 877 P.2d at 1240 (finding that "by

17   expressly carving out a specific intent requirement for bailees who convert property to their own

18   use," the legislature did not intend for such bailees to be prosecuted under the second prong of

19   NRS 205.300(1)).

20        Here, the Court finds that the Defendants argue that the Court can conclude, as a matter of

21   law, that Borchuwitz had probable cause to arrest Plaintiff for embezzlement, i.e. that he had

22   knowledge based on reasonably trustworthy information to believe Plaintiff was entrusted with

23   VEA funds that she converted for her personal benefit—the theft version of embezzlement under

24   Nevada law. Walsh, 887 P.2d at 1240.  Because the underlying form of embezzlement Borchuwitz

25   would have "reasonably believed" had occurred requires specific intent[4], Defendants must point

26

27        [4] Across the record, especially in Defendants' investigations into the work VEA performed in April
     of 2018 at the subject property, which Plaintiff bought in May of 2018, Defendants are focused on the first
28   "prong" of the embezzlement statute. See ECF No. 71-9 at 195:9-12. 195 (". . . it is not a big deal in our
     minds.  If you use your position for future personal gain, or use your position for present personal gain, I
     don't think that would have changed anything for us.").  This prong prohibits a bailee entrusted with

1    to undisputed facts on the record, relating to events prior to the arrest, that reasonably suggest

2    Plaintiff's intent to defraud VEA or steal from it in April 2018. Walsh, 887 P.2d at 1240.  For the

3    purposes of summary judgment, Defendants must show that no reasonable jury could find that

4    Boruchowitz lacked probable cause as to Plaintiff's intent to defraud or steal from VEA.  Gasho

5    v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994), cert. denied, 115 S. Ct. 2582 (1995).  The

6    Ninth Circuit defines specific intent as "a special mental element which is required above and

7    beyond any mental state required with respect to the *actus reus* of the crime." Easyriders Freedom

8    F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1499 n.7 (9th Cir. 1996) (quoting *Specific Intent*, Black's

9    Law Dictionary (6th ed. 1990)).

10          The Court finds that there is a dispute of material fact as to whether Borchuwitz had

11   probable cause to arrest Plaintiff for the specific intent crime of embezzlement.  Defendants make

12   two arguments as to this point. First, they argue Boruchowitz did not need probable cause as to

13   Plaintiff's intent to embezzle; this argument has been foreclosed by the Ninth Circuit's decision in

14   Gasho.  Gasho, 39 F.3d at 1428 ("when specific intent is a required element of the offense, the

15   arresting officer must have probable cause for that element in order to reasonably believe that a

16   crime has occurred.").

17          Second, they point to the side-room conversation Boruchowitz had with Plaintiff for two

18   minutes, on February 26, 2019, to establish probable cause as to Plaintiff's state of mind.  The

19   Court finds that the parties dispute what Boruchowitz knew or should have reasonably known

20   about what Plaintiff's role was at VEA in March and April of 2018, and what, if any, VEA property

21   she was entrusted with in that capacity.  The Parties further dispute whether Plaintiff's statements

22   to Boruchowitz before he arrested her suggest that she facilitated conversations between VEA and

23   her contractor about moving wires on the subject property, or whether she facilitated the work

24   itself.   The Parties further dispute whether this conversation reasonably shows (1) that Plaintiff

25   had "power and dominion" over VEA "property, good[s], or money" that (2) she intended to

26   convert for her own benefit and (3) did in fact convert for her own benefit.  Batin, 38 P.3d 880,

27   883 (Nev. 2002).  The Court also notes that materially, execution of the warrant took place in

28   ─────────────
     property or who has authority or power over property, to convert it for her personal use **with the intent to
     steal or defraud**.  Walsh, 887 P.2d at 1240 (emphasis added).

seven minutes, when Boruchowitz spoke with VEA CFO Morrison and two other employees; collectively, they did not answer many of Boruchowitz's questions and stated, among other things that they "were not [] engineer[s]," that the propriety of any work order was "out of [their] field," that the system "cannot search by address very well," that work orders were developed in a "complex process," and that the orders were likely "not even relevant to what [Boruchowitz was] looking for."

For these reasons, granting summary judgment at this stage would be inappropriate. See Reed v. Lieurance, 863 F.3d 1196 (9th Cir. 2017) (finding "that the district court improperly invaded the province of the jury when, at the summary judgment stage, it resolved factual disputes material to the question of probable cause[]" in a case concerning a specific intent crime).[5]

**B. Qualified Immunity**

Defendants argue that even if the Court finds a dispute of material fact about whether Plaintiff was falsely arrested in violation of her Fourth Amendment rights, Boruchowitz is entitled to qualified immunity.

In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). While a case directly on point is not required for a right to be clearly established, "existing precedent must have

---

[5] The Court also notes that Plaintiff argues that wrongful conduct undertaken in bad faith negates a finding of probable cause for the purposes of a Fourth Amendment false arrest claim. For this contention, Plaintiff cites to Awabdy v. City of Adelanto, 368 F.3d 1062 (9th Cir. 2004), which involved prosecutorial misconduct. In Awabdy, the Ninth Circuit held that "fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith" could rebut a presumption of probable cause (stemming from a grand jury indictment). 368 F.3d at 1067. However, the bar is significantly lower for false arrest claims; Plaintiff does not need to show bad faith acts to overcome any presumption of probable cause because there is no such presumption in a false arrest case. See, e.g. Merritt v. Arizona, 425 F.Supp. 3d 1201, 1210 (D. Ariz. 2019) ("[T]he presumption of probable cause arising from an indictment applies only in causes of action for malicious prosecution and is totally misplaced when applied in false arrest actions.") (internal citation and quotation marks omitted). The Court notes that based on the facts on the record, including those related to Boruchowitz's interest in reforming the VEA, his personal feelings toward Plaintiff, and his relationships with his "street sources" Johnson and Slagowitz, a reasonable jury could find that Boruchowitz did not rely on reasonably trustworthy information or take adequate steps to corroborate the same when he arrested Plaintiff. See, e.g., United States v. Ortiz-Hernandez, 427 F.3d 567, 574 (9th Cir. 2005) (noting that probable cause can dissipate or change as an investigation progresses).

- 13 -

1   placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731,

2   741 (2011). "To be clearly established, a right must be sufficiently clear that every reasonable

3   official would have understood that what he is doing violates that right." Hamby v. Hammond,

4   821 F.3d 1085, 1090 (9th Cir. 2016) (citing Taylor v. Barkes, 575 U.S. 822 (2015)). "An officer

5   is not entitled to a qualified immunity defense, however, where exculpatory evidence is ignored

6   that would negate a finding of probable cause." Kuehl v. Burtis, 173 F.3d 646, 651 (8th Cir. 1999).

7          It is clearly established that the warrantless arrest of an individual requires probable cause.

8   Blankenhorn, 485 F.3d at 470-71. The Ninth Circuit has even specifically found that warrantless

9   arrests lacking probable cause but based upon purported disrespect, or "to prove a point," are not

10  subject to qualified immunity. See Scott v. County of San Bernardino, 903 F.3d 943, 951 (9th Cir.

11  2018); Duran v. City of Douglas, 904 F.2d 1372, 1378 (9th Cir. 1990) (noting that "no matter how

12  peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop

13  unless it suggests that some specific crime has been or is about to be, committed."). Furthermore,

14  when an officer suspects a specific intent crime has taken place, there must be probable cause as

15  to the suspect's mental state before a warrantless arrest. Gasho 39 F.3d at 1428.

16         The Court first concludes that it was clearly established at the time of arrest in this case

17  that an arrest for embezzlement must be based upon probable cause as to the intent of the alleged

18  bailee, in the manner described in Gasho. Id. The second prong of the Saucier analysis is satisfied.

19         Defendants argue that probable cause is not a high bar, and that Boruchowitz had more

20  than enough information to reasonably believe Plaintiff had used her position at the VEA to benefit

21  herself by charging improvements to the rate payers, and that this sufficient for qualified immunity

22  purposes. What the law requires for probable cause, see Saucier v. Katz, 533 U.S. at 201, is

23  dependent on the crime the officer believes is or has taken place. Here, the crime in question is

24  embezzlement for personal benefit, and probable cause as to this crime requires facts and

25  circumstances that point to plaintiff's (1) control or entrustment over property of another and (2)

26  specific intent to exercise that control or entrustment for her own benefit.

27         However, as the Court has found, there are genuine issues of disputed fact regrading

28  probable cause in this case. In addition to those disputed facts already noted, the parties also dispute

whether Borchowitz's "street source" stated prior to the arrest that Plaintiff authorized VEA to perform work at her personal residence in April 2018 or merely that the work was completed at the property located at 3181 E. Winery Road and that VEA paid for it.  The parties also dispute whether it was reasonable for Boruchowitz to conclude, based on Parra's interview with Kaucky, that the work being done at 3181 E. Winery Street Property was done for Plaintiff's benefit and at Plaintiff's behest.  The parties dispute whether the two-minute conversation between Boruchowitz and Plaintiff before the arrest corroborates or establishes or points to what Plaintiff's role or power was within VEA in April 2018 and whether she knowingly abused this power for her own benefit.

These disputes of material fact pertain to the legality of an arrest for embezzlement—they relate to what Boruchowitz knew, reasonably should have known, or reasonably should have known he did *not* know, about Plaintiff's role at VEA in April 2018 and any *intentional* abuse of her power in that role, for her own benefit in April 2018.

In light of these disputes, the Court finds that Defendants have not met their burden of showing that Boruchowitz's actions at the time of the arrest entitle him to qualified immunity. "When there are disputed factual issues that are necessary to a qualified immunity decision these issues must first be determined by the jury before the [C]ourt can rule on qualified immunity." Morales v. Fry, 873 F.3d 817, 823-824 (9th Cir. 2017) (internal citation and quotation marks omitted).  Here, these disputed facts prevent the Court from finding Boruchowitz is entitled to qualified immunity. See Sandoval v. Las Vegas Metropolitan Police Dept., 756 F.3d 1154, 1166 (9th Cir. 2014) (overruling a district court's finding of qualified immunity because by "weighing the evidence in favor of the officers . . . the district court unfairly tipped the reasonableness inquiry in the officer's favor.").

**C.  Municipal Liability under §1983 (Monell Claims)**

Local government is liable for injuries wrought by government employees if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicted the injury." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).

Local government can be held liable if its failure to train employees amounts to "deliberate

- 15 -

indifference" to a constitutional right, such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989); Long v. County of Los Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006).

A local government may also be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority, or if such an official ratified a subordinate's unconstitutional decision or action and the basis for it." Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1097 (9th Cir. 2013).

A single decision of a municipal policymaker which ratifies or approves of the allegedly unconstitutional conduct of a municipal employee may form the basis of § 1983 municipality liability under Monell. The policymaker must have specifically approved of both the employee's decision and the basis for the decision, and the plaintiff must establish that the policymaker's decision was the product of a conscious, affirmative choice to ratify the conduct in question. Haugen v. Brosseau, 351 F.3d 372, 393 (9th Cir. 2003) (internal citation and quotation marks omitted).

Defendants argue that Plaintiff's § 1983 claim are subject to summary judgment because Plaintiff has not cited to any facts supporting a pattern or practice theory of liability.  First, Defendants argue that Plaintiff failed to identify a specific pattern or practice of falsifying search warrants in order to falsely arrest citizens or that NCSO "fostered the practice to arrest individuals without probable cause."  Second, they argue that to establish municipal liability, Plaintiff needs to do much more than rehash the allegations contained in her complaint; rather, she must proffer at least disputed facts in the record pointing to a policy that amounted to "deliberate indifference" to the constitutional right that the individual officer violated. Defendant argues that Plaintiff does not satisfy the requirements under Monell and has failed to advance a municipal liability claim.

Plaintiff argues that throughout the FAC, she raised a ratification theory of liability. Specifically, in her FAC she stated that NCSO "ordered, acquiesced in, tolerated, and permitted Boruchowitz to engage in the unconstitutional violations described herein" and that there were

policies and practices encouraging subordinates to "falsely and/or recklessly apply for search warrants without actual probable cause," leading to "unlawful arrest[s]."

Plaintiff further argues that facts obtained in discovery more specifically point to municipal liability.  First Sheriff Wehrly was the final decision maker on policies at the NCSO.  Since Boruchowitz performed his investigation, arrest, and supervision of Plaintiff "in full conformity with [NCSO] policy" according to Boruchowitz, Wehrly sanctioned his conduct. Plaintiff argues that despite Boruchowitz's television appearances speaking out against the VEA and his express communication to Sheriff Wehrly that he planned to run for a position on the VEA board, Sheriff Wehrly agreed to have Boruchowitz conduct Plaintiff's investigation. Plaintiff argues that Wehrly's conduct on the date of execution of the two February 2019 warrants also points to municipal liability. First, on February 21, 2019, Sheriff Wehrly was present for the execution of the first warrant. She witnessed Plaintiff's confinement to the conference room with other staff, and also expressly denied Plaintiff's request for access to an attorney. Next, regarding the February 26, 2019 warrant, Sheriff Wehrly was informed of the arrest shortly after it occurred, but effectively knew it was going to happen.  Before Plaintiff's arrest on February 26, 2019, "Sheriff Wehrly and Boruchowitz met with District Attorney Chris Arabia and Arabia "agreed with that arrest" and "was not opposed to it" at that meeting." Additionally, Sheriff Wehrly reviewed an application for an arrest warrant for Plaintiff.  After the arrest, Sheriff Wehrly directed Boruchowitz to post social media videos related to the arrest.  She expressed her views that the department could do whatever was necessary to get the information needed to arrest Plaintiff.

Defendants' counter that Plaintiff may not belatedly raise a ratification theory argument after failing to plead it properly in her complaint.  They were not on notice of a ratification theory argument throughout a year's worth of discovery, and Plaintiff's deficient pleadings did not give them any notice of a ratification argument.  Additionally, Plaintiff has independently failed to bring a successful ratification claim because here, the arrest was a warrantless arrest.  Sheriff Wehrly could not have ratified a warrantless arrest because she did not approve a warrant for it. She found out about the arrest after the fact, as Plaintiff herself notes. Because there is no evidence that Sheriff Wehrly "ratified" Borchuwitz's warrantless probable cause determination and eventual arrest,

1    Plaintiff's municipal liability claim under § 1983 fails.

2          The Court finds as a preliminary matter that there is no requirement that the word

3    "ratification" be used in a complaint to put Defendants on sufficient notice of a ratification theory

4    of liability. Christie v. Iopa, 176 F.3d 1231, 1238 (9th Cir. 1999) ("To show ratification, a plaintiff

5    must prove that the 'authorized policymakers approve a subordinate's decision and the basis for

6    it.'") (internal citation omitted). Here, Plaintiff's complaint uses words that get to a ratification

7    theory of liability; she states that NCSO "ordered, acquiesced in, tolerated, and permitted" officers

8    to falsely arrest citizens, in part based on whatever information they obtained through falsified

9    warrants.

10         Nevertheless, Plaintiff has failed to cite to sufficient facts on the record that establish any

11   theory of municipal liability as to her claimed false arrests.  First, the parties do not dispute that

12   under Nevada Law, Sheriff Wehrly is the final policymaking authority for NCSO.  See NRS §

13   280.307.  Sheriff Wehrly, however, did not approve the arrest and found out about the warrantless

14   arrest after the fact. Moreover, although Sheriff Werhly and Borchuwitz spoke with the District

15   Attorney Chris Arabia prior to the arrest, the record does not support a finding, even a disputed

16   one, that based upon this meeting Werhly was somehow made aware of and subsequently "ratified"

17   the disputed facts pointing to a lack of probable cause. See Gravelet-Blondin v. Shelton, 728 F.3d

18   1086, 1097 (9th Cir. 2013); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1986);

19   Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir.1992) (dismissing ratification claim because

20   plaintiff failed to establish that the final policy maker in that case "made a deliberate choice to

21   endorse the [subordinate's] decision and the basis for it.").

22         Finally, Plaintiff does not point to facts on the record that sufficiently establish a pattern or

23   practice of sanctioning warrantless arrests devoid of probable cause. For these reasons, Plaintiff's

24   municipal liability claims pursuant to § 1983 fail as a matter of law.

25       **D.  State Law False Arrest Claims**

26         Under Nevada law, a warrantless arrest is unlawful unless it is supported by probable cause.

27   "Probable cause to conduct a warrantless arrest exists when police have reasonably trustworthy

28   information of facts and circumstances that are sufficient in themselves to warrant a person of

1  reasonable caution to believe that an offense has been or is being committed by the person to be

2  arrested." <u>Doleman v. State</u>, 107 Nev. 409, 413, 812 P.2d 1287, 1289 (1991).

3      For the same reasons stated previously in this Order with respect to the Fourth Amendment

4  claim, this Court finds that summary judgment is inappropriate as to Plaintiff's common law false

5  arrest claim. Taking the facts on the record in the light most favorable to the Plaintiff, there are

6  genuine disputes of material fact, including but not limited to Boruchowitz's knowledge about

7  Plaintiff's power and dominion over the billing or commissioning of work at the subject property

8  in April 2018, and her intent to defraud or steal from VEA. Moreover, as noted there are genuine

9  issues of disputed fact as to the intent element of embezzlement. Summary judgment must

10  therefore be denied on this claim.

11  **E. Discretionary Immunity**

12      Under Nevada law, state actors are entitled to discretionary-function immunity if their

13  decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on

14  considerations of social, economic, or political policy." <u>Martinez v. Maruszczak</u>, 168 P.3d 720

15  (Nev. 2007); <u>see also</u> NRS § 41.032(2).  Acts committed in bad faith cannot be within the actor's

16  discretion.  <u>Falline v. GNLV Corp.</u>, 823 P.2d 888, 892 n.3 (Nev. 1991); <u>see also Scafidi v. Las</u>

17  <u>Vegas Metro. Police Dep't</u>, 966 F.3d 960 (9th Cir. 2020).  Acts are committed in bad faith when

18  the actor chooses a course of action without a reasonable basis or with knowledge or reckless

19  disregard of the lack of a reasonable basis for the choice. <u>Falline</u>, 823 P.2d at 891.

20      "[A]n abuse of discretion is characterized by an application of unreasonable judgment to a

21  decision that is within the actor's rightful prerogatives, whereas an act of bad faith has no

22  relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of

23  authority. For example, if an administrator decides to delay or deny a claimant's benefits because

24  of a personal dislike for the claimant, the delay or denial would be attributable to an unauthorized

25  act of bad faith [even though] a denial or delay could be otherwise among the rightful prerogatives

26  of the administrator." <u>Falline</u>, 823 P.2d at 892 n.3.

27      Defendant argues that Boruchowitz's actions are entitled to discretionary immunity

28  because the decision to make an arrest is inherently discretionary, and part of a policy consideration

that requires analysis of various public safety concerns. Plaintiff argues that Boruchowitz is not entitled to protection from discretionary immunity because he engaged in bad faith acts, which were necessarily beyond the scope of "discretionary" behavior. Plaintiff argues that the discretionary immunity doctrine only applies when the decision at issue involves an element of individual judgment or choice and is based on considerations of social, economic, and political policy. It does not protect against bad faith misconduct, because such misconduct cannot be within the government actor's discretion.

The Court finds that Plaintiff has presented sufficient disputed and undisputed facts to support a finding of bad faith misconduct. Boruchowitz allegedly had a personal interest in successfully removing the VEA Board members from the Board and Plaintiff from her position as CEO. First, he mentioned in a recorded conversation with Johnson that he would seriously consider running for a VEA Board position once the current Board had been ousted. He also committed to using his personal resources to support "Members for Change," the community-based organization he and Johnson ideated and created in support of their mission to change VEA leadership. Although Borchuwitz did not accept Johnson's offer of cash in an envelope, he merely stated that Johnson should hold on to the money and that they would "figure it out" after everything was done to avoid the appearance of impropriety. Plaintiff argues, and the Court agrees, that in light of these facts, Boruchowitz stood to personally gain from the scheme that led to Plaintiff's arrest, and that the warrantless arrest was made based on a bad faith personal agenda, rather than legitimate policy considerations. As such, Boruchowitz's actions are not protected by discretionary immunity.

Defendant counters that Boruchowitz's actions do not rise to the level of "bad faith misconduct" required to subvert the inherent leniency of Nevada's discretionary immunity doctrine. Specifically, Defendant argues that "bad faith" is narrowly defined as those actions outside of the government actor's authority. Because Boruchowitz did not act beyond the scope of his authority in arresting Plaintiff, he is entitled to discretionary immunity.

The Court finds that Boruchowitz's conduct could be attributed to bad faith, given the breadth of facts on the record, undisputed by Defendants, pointing to animosity he harbored toward

Plaintiff.  The Nevada Supreme Court clarified that identical action could be an abuse of discretion or an act of bad faith—the analysis turns on facts explaining the government actor's reasons for doing what they did.  Falline, 823 P.2d at 892 n.3.

Moreover, the Court finds that if Boruchowitz acted contrary to Nevada law and used his position to deliberately and unlawfully arrest Plaintiff for his own benefit, he was necessarily acting outside the scope of this authority as a police officer. A warrantless arrest could be an abuse of discretion and fall squarely within the protective ambit of discretionary immunity.  Here, however,  even though the "result is ostensibly within the actor's ambit of authority," a reasonable jury could deem it "attributable to an unauthorized act of bad faith," i.e. Defendants dislike and distrust of Plaintiff after the VEA rate hike.  See Sandoval, 756 F.3d at 1169 (denying discretionary immunity for a state law claim under Nevada law since a "reasonable juror" could find that the officers' conduct in that case were not an "exercise or abuse of discretion but instead constituted willful disregard for the law.") (internal citation and quotation marks omitted).  Because the record supports a finding that (1) Boruchowitz falsely arrested Plaintiff and (2) the false arrest is attributed to bad faith misconduct rather than mere abuse of discretion, Boruchowitz is not entitled to discretionary immunity as a matter of law.

**F. Motion to Seal**

Defendants have filed a motion to seal that is unopposed. ECF No. 64.  Defendants argue that VEA staking records and cost breakdowns included in Exhibit J to their Motion For Summary Judgment (ECF No. 63) should be filed under seal, as no public interest is served by making these documents publicly available, and it falls under the ambit of the parties' Protective Order (ECF No. 30) defining confidential documents during discovery.  Furthermore, Defendants argue that if these documents fall into the wrong hands, the confidential staking position of various cables could be made public, which would harm both the VEA and its members.

The Court agrees that pricing and details related to VEA's servicing processes and staking maps are sensitive information; moreover, there is added interest in keeping utility staking locations secure and confidential.  Since the need to keep this information confidential outweighs the public policies favoring disclosure, the Court grants the Motion to Seal.  Kamakana v. City &

1   Cty. of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006) (holding that compelling reasons for sealing

2   court records arise when "such court files [could] become a vehicle for improper purposes.")

3   (internal citation and quotation marks omitted).

4

5      **VI.      CONCLUSION**

6          **IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (ECF

7   No. 63) is DENIED in part and GRANTED in part.  The motion is DENIED as to Defendant

8   Boruchowitz and GRANTED as to Defendant Nye County.  Plaintiff's first and third claims may

9   proceed to trial, against Defendant Boruchowitz only.

10         **IT IS FURTHER ORDERED** that Defendants' unopposed motion to seal an exhibit (ECF

11  No. 64) is GRANTED.

12         **IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a supplemental brief

13  (ECF No. 81) and Defendant's motion to strike Plaintiff's motion (ECF No. 82) are DENIED as

14  moot.

15         **DATED**: January 19, 2023.

16

17                                                     _____

18                                                     **RICHARD F. BOULWARE, II**
                                                       **UNITED STATES DITRICT JUDGE**

19

20

21

22

23

24

25

26

27

28